FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2003 FEB -6  A 11: 07

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA to the use and benefit of BRADLEY INDUSTRIAL TEXTILES, INC. | : | |
| v. | : | Civil No. L-00-682 |
| CHATHAM REINSURANCE CORPORATION | : | |
| MARYLAND EXCAVATING AND DREDGING COMPANY | : | |
| v. | : | Civil No. L-00-2907 |
| BRADLEY INDUSTRIAL TEXTILES | : | |

## MEMORANDUM OPINION

These consolidated cases stem from a failed construction project. Bradley Industrial Textiles, Inc. ("Bradley Industrial"), filed suit to recover the unpaid purchase price of geotextile tubes and other materials that it furnished pursuant to a written contract.

Maryland Excavating and Dredging Company ("MEDCO") ordered the materials to complete a construction project for the Army Corps of Engineers ("Corps"). Chatham Reinsurance Corporation ("Chatham") was the surety on the payment bond posted by MEDCO. MEDCO counter-sued Bradley Industrial for damages it claims arose from defects in the design and manufacture of the geotextile tubes.

The Court held a three-day bench trial. For the reasons stated below, the Court rules as follows:

    (i)    neither the tubes, flange connection, nor pressurized elbow pipe system were defective;



(ii) fault for the failed construction project must be attributed to MEDCO for faulty planning and organization; and

(iii) Chatham's limitations defense is unavailing.

Accordingly, the Court will, by separate Order, (i) ENTER JUDGMENT for Bradley Industrial against MEDCO and Chatham, and (ii) DIRECT the CLERK to CLOSE the CASE.

## I. BACKGROUND

In the summer of 1998, the Corps requested bids for an erosion-control project on the Honga River, which is a tidal river on the Eastern Shore of Maryland's Chesapeake Bay. The project had two components: (i) to lay and fill 1500 feet of eight-feet-high geotextile tubing adjacent to an eroding island; and (ii) to dredge a channel and dump the dredge spoil between the tube barrier and the island, thereby creating an artificial wetland between the tubes and the shore.

The work had to take place during the annual environmental window, which runs from early June until the middle of November. It was contemplated that the project would be completed during the 1998 environmental window ("Season I"). Any work remaining at the close of the 1998 environmental window was to be finished in 1999 ("Season II"). Under the contract, the Corps could assess liquidated damages beginning on August 15, 1999.

MEDCO submitted the winning bid. The Corps required MEDCO to post a payment bond to protect subcontractors and suppliers. The bond was executed by Chatham for $474,200.

### A. The Supply Contract

MEDCO subcontracted the installation and filling of the geotextile tubes to Doug Piper's company, Victor Marine. Piper chose Bradley Industrial to provide the tubes. The supply contract called for fifteen 100-foot-long geotextile tubes, fifteen scour aprons to hold the tubes in

place, assorted supplies for sealing and repairing the tubes, and the equipment to attach the tubes to the adjacent barge.

Per the Corps's instructions, Piper inserted a clause requiring on site supervision by the supplier of the tubing.

### B.     Filling the Tubes

The mechanics of filling the tubes are relatively simple. Each tube is stretched out in the water. The large geotextile tubes are held in place by much smaller tubes called "scour aprons," which are laid parallel to the geotextile tube.

Moored near the tube is a barge loaded with sand that has either been barged in from a commercial supplier or dredged from the bay bottom. Mounted on the barge is a pump that is connected to a discharge pipe. The pump discharges a mixture of sand and water. Using a mixing valve, the crew can regulate the mixture from pure water to mostly sand.

At trial, there was testimony concerning two ways of attaching the discharge pipe to the geotextile tube and pumping in the fill material: (i) the "elephant trunk" system and (ii) a rigid flange system combined with a pressurized elbow pipe. For the elephant trunk system, a series of four or more holes are cut, either at the factory or in the field, in the top of the tube. Then, a fabric sleeve called an "elephant trunk" is sewn around the top of each hole. The elephant trunk closest to one end of the tube is connected to the discharge pipe, and a mixture of sand and water is pumped into the hole. After a pyramid of sand has been deposited, the discharge pipe is moved down a hole, and the fill process is repeated until the entire tube is completely filled with sand. The excess water exits through a relief hole. Once the tube is full of sand, the elephant trunks are removed and the holes are patched.

3

As designed, the tubes equipped with the elephant trunks are simple and easy to fill. The elephant trunk system has its drawbacks, however. The discharge pipe must be advanced from hole to hole, consuming time. Additionally, all elephant trunks must be removed and the holes patched.

Prior to 1998, MEDCO had used the elephant trunk system in another wetlands reclamation project on Smith Island (the "Smith Island project"). After Smith Island, Bradley Textiles developed an alternative method of filling tubes using a rigid flange combined with a pressurized elbow pipe.

The flange and pressurized elbow pipe system requires the cutting of two holes on the top of the tube at opposite ends. The flange is composed of two metal collars. The first collar is inserted through the hole in the tube and positioned so it frames the hole from the underside. The second collar is placed on the outside of the hole and the two collars are bolted together. A plastic, elbow-shaped pipe is fitted into the hole through the flange. The pipe is shaped like an elbow in order to redirect the incoming, pressurized mixture down the length of the tube towards the opposite end.

Initially, only water is pumped in to inflate the tube. Using the mixing valve, sand is added to the pressurized stream. Because sand is denser than water, the sand gradually fills the tube and the excess water is forced out through the relief hole cut at the far end of the tube.

The sand and water mixture is shot down the length of the tube. Because of the distance involved, the sand prematurely precipitates out of the stream, depositing short of the far end. If left unchecked, a mound of sand grows until it clogs the tube and prevents the tube from filling completely. When the tube is clogged, the operator must change the mixture to pure water to

clear a channel through the mound. Once a channel is cleared, the operator adjusts the mixture back to mostly sand, altering the fill mixture as necessary to deal with subsequent blockages.

The flange and pressurized elbow pipe system was used in the Honga River project. The advantage to the flange and pressurized elbow system lays in the fact that the discharge pipe does not require repositioning and only two holes must be patched after the tube is filled. The two drawbacks to the flange system are (i) the flange is difficult to install and (ii) filling the tube uniformly throughout the length requires more skill because the operator has to constantly monitor the mixture of sand and water.

All parties agree that the elephant trunk system functioned well. The principal dispute raised in this litigation is whether the flange and pressurized elbow pipe system worked.

### C.   Performance

Although MEDCO was awarded the contract in August 1998, MEDCO missed most of the environmental window through tardiness in mobilizing for the job. In October 1998, Bradley Industrial shipped 12 of the 15 tubes and scour aprons ordered under the supply contract.[1]

Victor's Marine had trouble installing the rigid flanges and filling the tubes using the pressurized elbow pipe system. Victor's Marine was able to successfully install only two geotextile tubes before the 1998 environmental window closed.[2]

During the winter, Victor's Marine and MEDCO severed their relationship and MEDCO assumed the supply contract with Bradley. On February 12, 1999, MEDCO paid Bradley $20,000 against the full 15 tube invoice of $57,750.

---

[1] None of MEDCO's tardiness in mobilizing during Season I is attributable to Bradley Industrial.

[2] Although Victor's Marine filled two tubes in 1998, one tube failed over the winter.

Rather than hire another subcontractor to install and fill the remaining geotextile tubing, MEDCO chose to assume direct responsibility for the project. In March 1999, MEDCO appointed Ellie Bitton to shepherd its Maryland projects to completion. Bitton hired Steve Koochin to manage the Honga River project.

Bitton knew that Victor's Marine had experienced difficulties. Bitton, however, did virtually nothing to explore these problems and solve them through training or selecting an alternative fill system. Either of these measures could have assured a smooth mobilization in 1999.

Although the environmental window reopened in June 1999, MEDCO got off to another late start because of a labor dispute and a failed safety inspection. In late 1999, MEDCO had fallen hopelessly behind and the Corps terminated the contract for default.

Bradley Industrial continued to perform the supply contract throughout this time. As mentioned, in October 1998, Bradley shipped 12 of the 15 tubes and scour aprons. In September 1999, Bradley Industrial shipped three scour aprons and other materials contemplated by the supply contract.

In August 1999, the Corps gave MEDCO $59,827.96, which was money due Bradley Industrial for 15 tubes, scour aprons, and assorted supplies. Although MEDCO made a February 1999 payment of $20,000, MEDCO never forwarded the balance of the Corps' payment to Bradley Industrial.

After terminating the MEDCO contract, the Corps hired Atlantic Diving to complete the project. When Atlantic Diving mobilized in 2000, it found that all eight tubes installed by Victor's Marine and MEDCO had failed. Atlantic Diving completed the project using elephant trunks to fill Bradley Industrial tubes. The completed project included three additional tubes

Bradley Industrial shipped in 2000, which were outstanding from the original contract. Atlantic Diving successfully finished the project in 2000.

### D. Claims for Relief

On March 9, 2000, Bradley Industrial filed suit against Chatham for nonpayment of the performance bond. On September 26, 2000, MEDCO sued Bradley Industrial for breach of contract. Bradley Industrial subsequently counter-claimed against MEDCO. By Order dated February 7, 2001, the Court consolidated these cases for trial.

The following claims have survived summary judgment and are disposed of by this memorandum:

**Bradley Industrial v. Chatham**, Civil No. L-00-682:

    (i)    Bradley Industrial's claim against Chatham for nonpayment of the performance bond, in violation of the Miller Act, 40 U.S.C. 270(b) (Count I); and

**MEDCO v. Bradley Industrial**, Civil No. L-00-2907:

    (i)    MEDCO's claim against Bradley Industrial for breach of contract (Count I),

    (ii)    MEDCO's claim against Bradley Industrial for breach of the implied warranties of merchantability and fitness for a particular purpose (Count II),

    (iii)    Bradley Industrial's counterclaim against MEDCO for breach of contract (Count I),

    (iv)    Bradley Industrial's counterclaim against MEDCO for breach of the Prompt Payment Act, 31 U.S.C. §§ 3901 *et seq.* (Count II), and

    (v)    Bradley Industrial's counterclaim against MEDCO for conversion (Count III).

The factual disputes underlying these legal theories are relatively simple. The Corps paid MEDCO the full amount of Bradley Industrial's invoices ($59,827.96). Under the Prompt Payment Act, MEDCO was obligated to forward these monies to the tube supplier within seven days of their receipt. Because MEDCO paid it only $20,000 of the full invoice, Bradley

7

Industrial argues that MEDCO (i) breached the payment terms of its supply contract, (ii) breached the timeliness requirement of the Prompt Payment Act, and (iii) converted the funds received from the Corps.

MEDCO sued Bradley Industrial for alleged defects in the geotextile tubes, flange attachment system, and pressurized elbow fill system. MEDCO alleged the following defects:

(i) the tubes are made from multiple layers of geotextile fabric. MEDCO claims that the tubes began to separate, or "delaminate;"

(ii) the flange attachment system was impossible to install as designed. Additionally, during the fill process, which involved stress from the pressurized stream of sand and water, the flange ripped away from the fabric of the tube; and

(iii) the pressurized elbow pipe system did not work properly because sand would not jet all the way to the far end of the tube. Rather, the sand would precipitate out of the water stream, clogging the tube and preventing the tube from filling completely. On Bradley Industrial's advice, MEDCO's crew made diligent efforts to clear a channel by shooting pure water down the length of the tube. This method did not work, however, because the channel quickly clogged again after sand was re-added to the mixture.

These defects, MEDCO claims, prevented it from timely completing the Honda River project. MEDCO also argues that Bradley Industrial breached the contract term requiring a manufacturing representative to be on site, supervising the installation of the geotextile tubes.

Chatham did not bring any independent claims, but relies upon the facts alleged by MEDCO as a defense to nonpayment of the surety bond. Additionally, Chatham claims that Bradley Industrial did not file suit within the one-year statute of limitations provided for by the Miller Act.

## III.   Evidence at Trial

The evidence presented at trial was largely testimonial. What follows is a list of witnesses and a brief synopsis of their testimony.

(i) **ANTHONY S. BRADLEY**, president of Bradley Industrial Textiles, Inc., testified as follows:

    (a) the geotextile tubes, rigid flange attachment, and pressurized elbow pipe system were properly designed and manufactured;

    (b) MEDCO's failure to complete the project was attributable to its lack of experience and organization;

    (c) the original 1998 shipment to MEDCO included a sewing machine, thread, 20 elephant trunks, and glue, so that MEDCO (or its subcontractor Victor's Marine) could install elephant trunks if it so chose;

    (d) in 1999, Mr. Bradley offered to install elephant trunks on the tubes if MEDCO would simply ship them to Bradley's factory in Florida. The factory could have sewn on elephant trunks with a four-day turnaround, including shipping;

    (e) his son, Holm Bradley, worked for Victors Marine in 1998. His son, who was experienced with the tubes, easily could have installed the elephant trunks in a week, had he been asked to do so; and

    (f) Mr. Bradley would have returned to the job site to provide additional supervision whenever needed, but MEDCO refused to compensate him for his time and travel expenses.

(ii) **CHARLES M. FRANKLIN, III**, from the Army Corps of Engineers, testified that Atlantic Diving, the contractor that replaced MEDCO, successfully installed the Bradley Textile tubes in the year 2000. Atlantic Diving used the elephant trunk fill system rather than the rigid flange and pressurized elbow pipe system to fill the tubes.

(iii) **ELLIE BITTON**, who was president of MEDCO in 1999, testified as follows:

    (a) he took charge of the Honda River project in 1999;

    (b) the pressurized elbow pipe system did not work;

    (c) some of the tubes delaminated;

    (d) Bradley Industrial breached its contractual obligation to supervise the filling of the tubes and train MEDCO's crew in the proper techniques; and

    (e) MEDCO's work crew was sufficiently skilled to complete the project had it been given adequate tubes and fill mechanisms.

(iv) **GILBERT A. TYLER**, a former MEDCO employee who worked on the Honda River project as well as the earlier, successful Smith Island project, testified as follows:

    (a)    the flange attachment was awkward and assembling it was a two-hour project;

    (b)    the pressurized elbow pipe system did not work properly because sand would not jet all the way to the far end of the tube. Rather, the sand would precipitate out of the water stream, clogging the tube and preventing it from filling completely;

    (c)    the tubes ripped at the junction of the rigid flange assembly and the geotextile fabric; and

    (d)    the Smith Island project used the elephant trunk fill system, which was easier than the system used for the Honda River project.

(v) **MICHAEL ("MICKEY") PELEG**, who works for Oceana International (MEDCO's parent company), worked on both the Smith Island and Honda River projects, and he testified as follows:

    (a)    on Smith Island, MEDCO used the elephant trunk fill system, and attached four elephant trunks to each 100-foot-long tube;

    (b)    the Smith Island fill system was easier to use and there was no problem with tearing fabric; and

    (c)    by comparison, the rigid flange assembly and pressurized elbow pipe system were difficult to use and generally unsatisfactory.

(vi) **DOUG PIPER**, the president of Victor's Marine, testified by deposition as follows:

    (a)    he was supposed to start the Honda River project in the summer of 1998, but because of MEDCO's delays in mobilizing, he did not start the project until October;

    (b)    when he unpacked the tubes, he was surprised to learn that the flanges were not preinstalled;[3]

    (c)    when Piper's men were unable to install the flanges, Bradley traveled to the site;

---

[3] MEDCO ordered two flanges, intending to install the flanges on site rather than paying Bradley to preinstall 15 flanges at the factory. A flange assembly can be used over and over.

- (d) although he and Bradley disagreed about the effectiveness of Bradley's method for attaching the flange, Piper made a field correction and figured out how to install a flange in 1-2 hours;

- (e) in an ideal world, Piper felt that the flange installation should have taken less than five minutes per assembly;

- (f) nevertheless, the time lost in installing the flanges was not fatal to the Honga River project;

- (g) it did not matter that a Bradley Textiles' representative was not continuously on site because Holm Bradley, the tube-supplier's son, was a member of the work crew. In his experience, the clause in government contracts requiring the manufacturer's representative to be on site is honored in the breach;

- (h) the pressurized elbow pipe system was as good as or better than the old elephant trunk system. Although it took a while to install the flange assembly, the pressurized fill system was faster because the crew had to move the adjacent barge only once, rather than two, three, or four times;

- (i) echoing the testimony of Anthony Bradley, Piper said that the tubes could be cut and patched in the field;

- (j) concerning the delamination issue, Piper said that three or four lose pieces of fabric had to be glued, but that this did not present a major problem;

- (k) Piper was unable to finish the project in 1998 because of (1) the late start, (2) MEDCO did not supply sufficient equipment, (3) a crane stopped functioning, and (4) a boat sank; and

- (l) although Piper did not finish the project during Season I, he anticipated that he and his men would return in Season II to finish the job using the flange and pressurized elbow fill system.

(vii) **STEVE KOOCHIN**, who was MEDCO's on-site supervisor during Season II, testified by deposition as follows:

- (a) he was on site during Season I, and he helped Doug Piper work out a system for installing the flanges;

- (b) he felt that Anthony Bradley fulfilled the contract requirement by supervising the crew in 1998, and he said it was reasonable for Bradley to demand reimbursement for time and travel to instruct the new work crew in 1999;

(c) notwithstanding that MEDCO refused to reimburse him, Bradley did travel to the site in 1999, although his trip was cut short by bad weather;

(d) Koochin was satisfied with the rigid flanges and felt that they were suitable for the project, so that he did not need new tubes outfitted with elephant trunks. Moreover, Koochin believed that the flange and pressurized elbow fill system worked well once he figured out how to use it properly;

(e) regarding the tearing around the intersection of the flange and fabric, Koochin said that the crew ripped the tubes through rough handling with the cranes;

(f) Koochin corroborated Bradley's testimony that Bradley had offered to retrofit the tubes with elephant trunks;

(g) the original problems with the flange system, while a hindrance, were not fatal to the project;

(h) Koochin eventually quit because of a disagreement with Ellie Bitton over MEDCO's attempts to cut costs. The crew had originally used a Toyo Pump, but it was repossessed. Bitton told Koochin to finish the project with a cheaper, less effective pump. Because "you can't go cheap" in dredging, Koochin quit out of frustration; and

(i) Koochin assigned primary blame for failure to complete the project in Season II to MEDCO's disorganization and equipment failures.

(viii) **ROBERT N. BLAMA**, the project manager for the Army Corps of Engineers, testified as follows:

(a) government regulations required a representative of Bradley Industrial to be on site when the tubes are filled. Blama did not care, however, if the manufacturer's representative was there the entire time. In his view, one day's supervision would have been sufficient. This clause was designed to force the contractor to get together with the materials supplier and make sure that the tubes were installed correctly;

(b) both Piper and Koochin had reported that they were satisfied with the instruction from Bradley. Accordingly, Blama felt that Bradley Industrial had fulfilled the supervision requirement in 1998 when he instructed Doug Piper on the proper method of installing the flanges and filling the tubes;

(d) Blama visited the site during Season I and Season II, and he saw that the contractor was having problems filling the tubes. He said that the problems stemmed from the sand supply, the pump, and the fact that the laborers were not getting paid;

12

    (e)    in all, MEDCO filled eight tubes, which were all accepted by the Corps of Engineers. All eight eventually failed, however; and

    (g)    Atlantic Diving elected to fill the tubes with elephant trunks, and it experienced no difficulty in completing the project.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The Materials and Instructions Provided by Bradley were not Defective

It is obvious that both the flange attachment system and the pressurized elbow pipe fill system were difficult to employ. This does not mean, however, that these systems were impracticable or impossible to use.

In resolving the factual disputes, the Court relies upon the testimony of Piper and Koochin, who have no stake in the outcome of the case. Piper was not satisfied with the flange apparatus and had anticipated a system which could be hooked up in a few minutes. Nevertheless, he did not find the installation impossible or unreasonably difficult. Piper testified that, once he figured out how to properly attach the flange to the tube, he devised a system whereby two workmen could attach the flange in roughly two hours. When Koochin took over in Season II, he experienced the same difficulties as those faced by Piper. However, he echoed Piper's assessment that the flange system, while unwieldy, did work.

Regarding the clogging problem, Bradley testified that this problem was to be expected. The solution was to shoot water (without sand) to the end of the tube. The water would clear a channel through the obstruction, allowing the crew to resume piping a mixture of sand and water. Moreover, both Koochin and Piper testified that they had successfully used the pressurized elbow pipe to fill geotextile tubes.

Concerning the delamination issue, the Court credits Piper's testimony that, while a headache, delamination did not pose a major problem because the layers could be glued back together.

Regarding the tearing associated with the rigid flange assembly, the Court credits Koochin's testimony that this problem was primarily a result of rough handling by the inexperienced work crews and not a defect attributable to the flange system.

Accordingly, the Court finds that Bradley Industrial satisfied its obligations under the supply contract, thereby triggering MEDCO's duty to pay.

### B.     Fault for the Failed Project Must Be Attributed to MEDCO.

There is considerable evidence that MEDCO's lack of organization caused numerous problems in Seasons I and II. As Piper testified, the fill operation in Season I was hampered by a late start. There was also evidence that MEDCO's start in Season II was delayed by a labor dispute and a failed safety inspection.

As stated, Phase I ended in mid-November, 1998. This gave MEDCO more than six months to study any problems and solve them before the environmental window reopened in June 1999. It's clear from the testimony that MEDCO failed to take advantage of this opportunity. Had MEDCO investigated Piper's reported difficulties, it might have become concerned about the practicality of the flange and elbow system. A number of solutions were readily available during the break between Season I and Season II. For instance, MEDCO could have taken the following steps:

    (i)    MEDCO could have shipped the tubes back to the factory for the installation of elephant trunks;

      (ii)     MEDCO could have shipped the tubes back to the factory for the installation of multiple flanges, which would have eliminated much of the time spent cutting open the tubes and attaching the flanges on site;

      (iii)    using the materials and sewing machine supplied by Bradley Textile, MEDCO could have installed elephant trunks in the field; and

      (iv)    MEDCO could have ordered additional flanges and installed them before the start of Season II.

In short, although MEDCO was aware of the problems in Season I, it did virtually nothing to prepare for a smooth fill process in Season II.

Additionally, the Court credits the testimony of Robert Blama, a Corps employee with nothing at stake in this litigation. Blama testified that the problems he observed in Seasons I and II stemmed from labor disputes, an inadequate pump, and problems with the sand supply. In other words, Blama saw problems whose solutions lay within MEDCO's exclusive control.

Accordingly, fault for the failed project must be laid at MEDCO's door, thereby precluding it from prevailing against Bradley Industrial.

### C. Chatham's Limitations Defense is Unavailing

Under the Miller Act, a claimant must sue the surety within one year of default. Essentially, Chatham contends that MEDCO should have paid Bradley in October 1998, when it accepted the original shipment of 12 of the 15 tubes and scour aprons. Because Bradley did not sue until March of 2000, Chatham argues that Bradley is foreclosed by the one-year statute of limitations.

The Court disagrees. The October 1998 shipment was merely part performance of the supply contract. Bradley Industrial continued to perform through September of 1999, when it shipped the additional scour aprons and other materials contemplated by the contract. Bradley

15

Industrial's continued performance tolled the statute of limitations until at least September of 1999.

Accordingly, Bradley Industrial's claim against Chatham was timely filed in March of 2000.

## IV. CONCLUSION

Although MEDCO should have paid Bradley Textiles, the Court finds that MEDCO did not act with malice. Accordingly, the Court will not award punitive damages under Bradley Industrial's conversion claim. The Court will, by separate Order, (i) ENTER JUDGMENT for Bradley Industrial on all counts and (ii) DIRECT the CLERK to CLOSE the CASE.

Dated this 4/7H day of February, 2003.

Benson Everett Legg
Chief Judge